UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

ALBERT LOPEZ VICTORY,

                              Plaintiff,

        v.                                                    **DECISION AND ORDER**
                                                             02-CV-0031

GEORGE PATAKI, et al.,

                              Defendants.


## I.  INTRODUCTION

Plaintiff Albert Lopez Victory ("Plaintiff"), a former inmate in the care and custody

of New York Department of Corrections and Community Supervision ("DOCCS"), brings

this action pursuant to 42 U.S.C. § 1983 and the New York State Constitution, alleging that

George Pataki, Brion D. Travis, Thomas P. Grant, Mike Hayden, Ronald P. White,

Terrance X. Tracy, Kenneth E. Graber, George Chard, Douglas C. Smith, Salvatore

Perritano, and Kevin McCarthy (collectively, the "State Defendants"), and the City of

Syracuse, Thomas Murfitt, Rory D. Gilhooley, John Falge , Dennis DuVal, and Gary Miguel

(collectively, the "Syracuse Defendants") conspired to deny him parole and to cause him

to violate his parole once it had been granted. (2d Am. Compl. (Docket No. 162) ¶¶ 2, 101-

129.)

Presently before this Court are the State Defendants' and the Syracuse Defendants'

motions for summary judgment.[1]  Having considered the parties' written submissions and

---

[1] In support of their motion, the State Defendants have filed a memorandum of law, a statement of undisputed facts, an attorney declaration with exhibits, and a reply memorandum of law. (Docket Nos. 228, 253.). The Syracuse Defendants have also filed a memorandum of law, a statement of undisputed facts, an attorney declaration with exhibits, and a reply memorandum of law. (Docket Nos. 230, 245.) In opposition to the dispositive motions, Plaintiff has filed a combined memorandum of law, a response to the State

the applicable law, this Court grants both the State Defendants' and the Syracuse Defendants' motions, and dismisses the amended complaint.

## II. BACKGROUND

### A.    Factual Background and Procedural History

The following facts are not in dispute unless otherwise noted. The Court has considered whether the parties have proffered admissible evidence in support of their positions and has viewed the facts in the light most favorable to Plaintiff. See Spiegel v. Schulmann, 604 F.3d 72, 77, 81 (2d Cir. 2010).

Plaintiff's case comes before this Court with a complex procedural history, including numerous petitions and appeals within the state system, and subsequent affirmances and reversals. The Court will therefore only recite the facts relevant to the instant motions and in chronological order as applicable.

#### 1.    The Parties

##### a.    The State Defendants

George Pataki ("Pataki or "Gov. Pataki") was the Governor of New York State from 1995 to 2006. Brion Travis ("Travis" or "Chair. Travis") was the Chairman of the New York State Board of Parole (the "Parole Board" or the "Board") from March 18, 1995 to February

---

Defendants' statement of undisputed facts, a response to the Syracuse Defendants' statement of undisputed facts, an attorney declaration with exhibits, and a supplemental attorney declaration. (Docket Nos. 241, 244.) Plaintiff has also submitted an additional "statement of material facts in dispute" which is comprised of 680 paragraphs spanning 100 pages. Because Local Rule 56 does not provide for such a filing, this Court need not consider it. See Loc. R. Civ. Proc. 56(a)(2) ("The papers opposing a motion for summary judgment shall include a response to each numbered paragraph in the moving party's statement, in correspondingly numbered paragraphs and, if necessary, additional paragraphs containing a short and concise statement of additional material facts as to which it is contended there exists a genuine issue to be tried."); see also, Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 73 (2d Cir. 2001) ("[a] district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules.") (citations omitted).

29, 2004, later becoming the Chief Executive Officer of the Division of Parole ("DOP"). During this time, Thomas Grant ("Grant" or "Asst. Grant") was Special Assistant to Travis, the Chairman of the Board of Parole.

In 1999 Mike Hayden ("Hayden") was the Acting Chief of Operations of the DOP, later becoming the Director of the Central Adirondack Region of the DOP in 2000. Ronald White ("White" or "Dir. White") was the Director for Upstate Parole Operations for DOP. Terrance Tracy ("Tracy") served as Counsel to DOP. From October 1995 to April 2002, Kenneth Graber ("Graber" or "Commr. Graber") was a member/commissioner of the Board of Parole.

Kevin McCarthy ("McCarthy" or "Parole Officer McCarthy") was a Parole Officer with DOP, assigned to the Absconder Search Unit and handled Bureau of Special Services Cases in the Syracuse area. George Chard ("Chard" or "Parole Officer Chard") was a Senior Parole Officer employed by DOP. Douglas Smith ("Smith" or "Supr. Smith") was Area Supervisor for Syracuse and Utica DOP Offices. (Smith Decl. ¶ 1.) Plaintiff disputes that Smith's position covered both offices, and asserts that Robert Kent was the Area Supervisor for the Syracuse DOP Office. (Pl. Ex. JJJ (Kent Dep.) at 25.) Salvatore Perritano ("Perritano" or "Parole Officer Perritano") was a Parole Officer with DOP.

At all times relevant to the instant action, the Board of Parole consisted of up to sixteen members appointed by Gov. Pataki. During a Board member's term of service, he or she may be removed by the Governor for cause after an opportunity to be heard. The member designated as Chairman of the Board is selected by and serves at the pleasure of the Governor.  The Board of Parole possesses authority regarding whether inmates should be granted parole, and whether parolees should have their parole revoked, while

the DOP prepares inmate cases for parole review and supervises parolees when they are released.

During his tenure as Governor, Pataki had a stated policy of instituting reforms to the laws of New York State to eliminate parole for all individuals sentenced as violent felons, which he attempted to implement by asking the State Legislature to change the laws regarding parole. Pataki was successful during his first term, ending certain types of early release and work release for violent felons by executive order. Also during Pataki's first term, the legislature amended the statutes regarding the sentencing of repeat felony offenders, which eliminated parole for such prisoners. Pataki did not involve himself in the day to day operations of the DOP or Board of Parole.

### b.    The Syracuse Defendants

The Syracuse Defendants are comprised of the City of Syracuse, Syracuse Police Officer Thomas Murfitt ("Murfitt" or "SPD Officer Murfitt"), Syracuse Police Officer Rory Gilhooley ("Gilhooley" or "SPD Officer Gilhooley") and former Chiefs of the Syracuse Police Department Dennis DuVal, Gary Miguel, and John Falge.

### 2.    Plaintiff's History, Parole Review, and Release

Plaintiff entered DOCCS custody on May 26, 1970, to serve a twenty-five year to life sentence upon his conviction of felony murder in New York County Supreme Court, stemming from his involvement in the shooting death of a police officer outside a New York City discotheque on October 7, 1968. The conviction was upheld by the New York Court of Appeals. People v. Bornholdt, 33 N.Y.2d 75 (1973).

In 1978, Plaintiff escaped from prison and remained at large for nearly three years until he was apprehended in the State of California and returned to DOCCS custody in

4

New York.

Plaintiff first became eligible for release to parole supervision in 1997, and his initial application was denied. Between 1997 and 1999, Plaintiff appeared twice before the Parole Board, with each panel consisting of two members/commissioners. Neither of those panels could reach a consensus for granting or denying parole, thus leaving the issue of Plaintiff's release to parole supervision unresolved.

Shortly after those appearances, Plaintiff's attorney, Myron Beldock, Esq. ("Beldock"), telephoned Tracy, DOP's counsel,  to discuss the previous Board panels which had been deadlocked. While Tracy was familiar with Plaintiff's name from his tenure as an Assistant Attorney General, Tracy was not involved in Plaintiff's previous litigation, the murder conviction, or the parole proceedings. Beldock inquired whether it would be possible for Plaintiff to appear before a three-member panel, so as to avoid the possibility of another deadlock, and sent a letter to Tracy to the same effect. Tracy shared that letter with Chair. Travis.

Tracy also discussed Plaintiff's case with Board Commissioner Mary Ellen Jones, who informed Tracy of Plaintiff's murder conviction. Tracy, Asst. Grant, and Dir. White had all, in some manner, become aware of Plaintiff's case prior to Plaintiff's next Parole Board appearance. Plaintiff's name had appeared on a list of high-profile cases due to the nature of his conviction, which was prepared by non-party Anthony Molik ("Molik"), the Facility Parole Officer at Attica Correctional Facility.

Plaintiff was again considered for parole release on January 11, 1999, by a two-member panel consisting of Commissioners Graber and  Lawrence Scott.  Graber states

that he was not familiar with Plaintiff or his case prior to the January 11 hearing.[2] (Graber Decl. ¶ 5.)

Each commissioner would be assigned a particular parole application case, and, on the day of Plaintiff's hearing, Commissioner Scott was responsible for Plaintiff's case and conducted Plaintiff's interview.[3] Following that hearing, Commissioners Graber and Scott voted to grant parole release to Plaintiff with an open date of March 11, 1999. Graber states that at the time the decision was made to release Plaintiff, he was unaware of Plaintiff's thirty-four month escape from prison. (Graber Decl. ¶ 9.) Although not specifically enumerated in N.Y. Exec L. § 259-i (setting forth mandatory considerations for discretionary release on parole), a prior escape is generally considered a negative component of an inmate's institutional record, which must be considered by the Parole Board in determining whether to grant an inmate parole.[4] (Travis Decl. ¶ 17.)

Asst. Grant was made aware of the results of Plaintiff's parole hearing from a DOP computer printout, while Tracy became aware of of the results on the day of the hearing

---

[2] Plaintiff contends that Commissioner Mary Ellen Jones told Defendants Grant and Tracy that Graber stated that he was inclined to vote to release Plaintiff. The evidence regarding Graber's statement is hearsay, and thus the Court need not consider this evidence. See Raskin v. Wyatt Co., 125 F.3d 55, 66 (2d Cir. 1997) ("only admissible evidence need be considered by the trial court in ruling on a motion for summary judgment.") Going forward, this Court will disregard a number of Plaintiff's disputed facts that rely on hearsay evidence without further discussion.

[3] The State Defendants' statement of facts erroneously refers to Scott as "Smith". (State Def. Stmt. ¶¶ 47-48.) Apparently a typographical error, the source cited and the Plaintiff's papers indicate it was Commissioner Scott, not Commissioner Smith, who presided over the parole hearing after which Plaintiff was ultimately granted release on parole. (Graber Decl. ¶¶ 9-10; Pl. Resp. to State Def. Stmt. (Docket No. 239) ¶¶ 47-48.)

[4] Plaintiff disputes this, yet provides no support for his assertion. (Pl. Resp. to State Def. Stmt. ¶ 50.) New York courts have held that prisoner's escape history is relevant information in considering eligibility for parole. See Tatta v. Dennison, 26 A.D.3d 663 (3rd Dep't 2006) (Parole Board properly considered the violent nature of plaintiff's offense, criminal history, institutional record, and previous escape).

or the following day. Subsequently, Tracy reviewed Plaintiff's "central file," a less complete version of the DOP's "facility file," which is maintained at the correctional facility where the inmate is housed, in this case, Attica Correctional Facility. (Tracy Decl. ¶¶ 11, 14; White Decl. ¶ 16.) Tracy had not previously reviewed either of Plaintiff's DOP files. A few days following Plaintiff's grant of parole, Chair. Travis was notified by Tracy that Commr. Graber, in reviewing Plaintiff's case, had inadvertently overlooked Plaintiff's escape from custody in his file.

Katherine Lapp ("Lapp" or "Dir. Lapp"), Director of Criminal Justice for the New York State Division of Criminal Justice Services ("DCJS") first learned of Plaintiff's parole decision sometime in 1999.  Lapp's role as Director of DCJS was to oversee the state police, DOCCS, DOP, and Crime Victims Board, in addition to other state criminal justice agencies.

 According to the State Defendants, Chair. Travis suggested to Asst. Grant that he call Lapp to notify her that Plaintiff had been released on parole. (Grant Decl. ¶ 11.) Plaintiff disputes this, claiming that Travis did not recall telling Grant to notify Lapp of the Parole Board's decision, and that Travis only "knew that [Lapp] was involved after the [parole] case was decided. . . ." (Pl. Ex. N (Travis Dep.) at 77, 124.)  In any event, Grant called Lapp, summarized Plaintiff's case, and provided the information regarding Plaintiff's escape from custody in the 1970s. Later, Lapp phoned Asst. Grant and requested to see the file that the two parole commissioners had before them when they voted to release Plaintiff.  Grant arranged to have Plaintiff's facility file sent to the DOP Albany office from Attica Correctional Facility.  At some point, Hayden also instructed Dir. White to arrange for Plaintiff's facility file to be sent from Attica to the DOP in Albany. Although Asst. Grant

states that he informed Chair. Travis of the file being sent to Albany, Travis testified that he was unaware of any such request. (Grant Decl. ¶¶ 14-15; Pl. Ex. N (Travis Dep.) at 119.)

A portion of Plaintiff's facility file was initially sent to DOP by fax. Asst. Grant states that "after approximately three hours of [incoming] faxing I put the incomplete faxed file together in a box and went to the [DCJS] to deliver the file to Director Lapp. I was accompanied by Terrence Tracy . . . ." (Grant Decl. ¶ 16.) According to the State Defendants, the Plaintiff's facility file was initially sent by fax because a snow storm prevented the facility file from being physically transported from Attica to Albany on January 12 and 13, 1999. (White Decl. ¶ 17; State Def. Reply (Docket No. 253), Exs. B-C.)

When Commr. Graber was informed that the Plaintiff's file was being sent to Albany, he phoned Tracy, who was in Asst. Grant's office at the time. It was at this point, according to the State Defendants, that Tracy and Grant had learned that Graber had overlooked Plaintiff's escape history in the parole file. Sometime thereafter, Tracy notified Chair. Travis that Graber was unaware of the escape, and informed Travis that he would be discussing the case with Lapp.

Before the complete copy of Plaintiff's facility file was received at the DOP central office in Albany, Grant and Tracy took the incomplete file, which had arrived by fax, to DCJS to deliver the file to Lapp at her request. Once there, Lapp instructed Grant and Tracy to review the complete facility file when it arrived and report their findings to Chair. Travis. Tracy had no further conversations with Lapp regarding Plaintiff's case.

The physical facility file was eventually delivered to Albany, although neither party specifies when that occurred. Tracy also directed that a separate file maintained by the

8

DOP Bureau of Special Services be brought to him, which arrived on January 15, 1999.

In 1995, the Parole Office at Southport Correctional Facility wrote a letter to Robert Morganthau, then New York County District Attorney, whose office had prosecuted Plaintiff. That letter, referred to herein as the "Southport Letter," was drafted prior to Plaintiff's first parole appearance scheduled in 1997, and requested information from the New York County District Attorney's Office that would be germane to Plaintiff's hearing, such as Plaintiff's history, conduct, and statements from the victims of Plaintiff's crime.[5]   After having met with Tracy, Lapp faxed a copy of the Southport Letter to James Kindler ("Kindler" or "ADA Kindler"), an Assistant District Attorney for New York County. Lapp phoned Kindler later to inquire whether he received the letter and whether he had made a decision to respond to it. (State Def. Ex. B (Lapp Dep.) at 118-120, 124-131.) She also testified that she recalled speaking to Kindler prior to faxing the letter. (Id. at 120.) Kindler testified that when Lapp called, she told him that Plaintiff had been granted parole, and asked if his office had any information that they could supply to the Parole Board relevant to Plaintiff's case.

On January 14, 1999, ADA Kindler wrote a letter addressed to Tracy at the DOP, opposing Plaintiff's release to parole  ("Kindler Letter"). The letter was received on January 14 or the day after. In late January, 1999, Molik informed Beldock that the same letter had been sent to the DOP's Counsel's Office.

---

[5] Neither party addresses whether the Southport Letter was responded to in advance of any of Plaintiff's previous parole hearings.

### 3.    Rescission Hearing

After Plaintiff had been granted parole but before his scheduled release date of March 11, 1999, Hayden directed that Plaintiff not be provided with the results of the January 11, 1999 hearing. (Hayden Decl. ¶ 13; White Decl. ¶ 20.).  Molik confirmed that he received such a direction, but did not remember from whom.  (Def. Ex. C (Molik Dep.) at 99.)[6]

Following his review of Plaintiff's DOP files, Tracy met with Chair. Travis, and informed him that Commr. Graber had been unaware of Plaintiff's escape, that a letter had been received from the District Attorney's Office, and that Tracy had reviewed the DOP file maintained by the Bureau of Special Services regarding the Plaintiff, which had not been available to the Parole Board panel at the time of Plaintiff's release. Tracy did not reveal the contents of that file to Travis.

Chair. Travis discussed with Tracy the mechanism for initiating a rescission hearing and the parameters of such a hearing.[7] New York regulations provide that a rescission hearing is initiated by DOP "operations," or parole officers. See 9 N.Y.C.R.R. § 8002.5(b)(1). All further communications between Tracy and Chair. Travis concerned the status of the Plaintiff's litigation initiated with regard to his parole status.

Ultimately a decision was made to hold a rescission hearing in Plaintiff's case, and Hayden then contacted DOP personnel at Attica to inform them of that decision. The

---

[6] Plaintiff contends it was Lapp that gave the original instruction to hold the results of Plaintiff's parole hearing, but the sources cited do not support the fact asserted or are missing from the record. (Pl. Ex. L (Lapp Dep.) at 50-51; Ex. P (Hayden Dep.) at 52; Ex. HH (White Dep.) at 40 (page missing)).

[7] Again, Plaintiff disputes that this topic was discussed, but points to a citation absent from the record. (Pl. Ex. N (Travis Dep.) at 49 (page missing)). From here on out this Court disregards the remainder of Plaintiff's disputed facts that are not supported by a valid citation.

parties dispute, however, who initially recommended that a rescission hearing be held. The State Defendants urge that Molik made the recommendation, who testified that he ordered a rescission hearing based on the information contained in the Kindler Letter. (Def. Ex. C (Molik Dep.) at 139-142.) Plaintiff does not dispute that Molik made the official order, but states that Hayden initially advised Molik that "a rescission hearing [was] in order" after Tracy indicated that there was new or unknown information, i.e. Plaintiff's escape, that had not been considered at the original parole hearing. (Pl. Ex. P (Hayden Dep.) at 64-65.) Accordingly, Plaintiff was served with the notice that he had been granted parole, along with a notice of temporary suspension informing him that his release would be suspended.

Defendants Graber, Hayden, and Tracy were not involved in the decision to conduct the rescission hearing, but Hayden testified that Plaintiff's case and the unnoted escape were subjects of discussion between Hayden and Tracy prior to the decision being made to attempt to rescind Plaintiff's parole. (Graber Decl. ¶ 13; Hayden Decl. ¶ 13; Tracy Decl. ¶ 40; Pl. Ex. P (Hayden Dep.) at 64.)

According to the State Defendants, Chair. Travis did not involve himself in individual parole decisions and did not assign Board members to individual panels. (Travis Decl. ¶¶ 8-10.) Travis acknowledges that he became involved with Plaintiff's parole file after learning from Tracy that Plaintiff had been granted parole. (Travis Decl. ¶¶ 16-27.) The parties disagree as to the extent to which Travis was involved, but it is undisputed that Travis also did not take part in making the decision to schedule a rescission hearing for Plaintiff. (Id.; Tracy Decl. ¶ 16; Pl. Ex. Q (Tracy Dep.) at 153, 159-62; Pl. Ex. V (Graber Dep.) at 36-37.) Tracy did advise Chair. Travis on the legal parameters of a rescission hearing.

On February 3, 1999, Molik prepared a Rescission Hearing Report, recommending that a hearing be held based on the information contained in the Kindler Letter dated January 14, 1999. In March of 1999, Federal District Judge John F. Keenan ("Judge Keenan"), the former Assistant District Attorney who had originally prosecuted Plaintiff, also wrote a letter opposing Plaintiff's release ("Keenan Letter"). That letter was addressed and faxed to Gov. Pataki on March 8, 1999, and sent to the DOP on the same date. James McGuire ("McGuire"), then counsel to Gov. Pataki, testified that he may have spoken to Judge Keenan about Plaintiff's parole case, but had no recollection of any particular conversation. (State Def. Ex. E (McGuire Dep.) at 12, 46-47, 50-53.) Though McGuire did not recall discussing the Plaintiff's case with Gov. Pataki, he did discuss it with Dir. Lapp. In March, 1999, Lapp communicated to Chair. Travis her request that the Keenan Letter concerning Plaintiff be available in all future parole deliberations.

Commr. Graber was assigned to sit on the rescission hearing panel, which met at Attica in March, 1999. Whether Commr. Graber was assigned to the Attica March panel prior to the rescission hearing being scheduled is disputed by the parties. (Graber Decl. ¶ 14; Pl. Ex. V (Graber Dep.) at 77-78.) Typically, the composition of the parole panels is designated approximately one month prior to the date in which cases are heard. The names of the three commissioners sitting on the panel were provided to Dir. White prior to the hearing, but he had no role in assigning members to specific panels. Rather, assignments of Board members to individual panels were made by the secretary to the Board.

Prior to the rescission hearing, Dir. White was in contact with Molik regarding various procedural matters involved in the hearing. Molik made the preparations for

presentation of Plaintiff's case to the three-commissioner parole panel, and his activity in preparing the case was independent of the Board.

On March 5, 1999, Tracy faxed a copy of the Kindler Letter to Beldock, Plaintiff's attorney. Immediately prior to the rescission hearing, Molik provided Beldock with a copy of the Keenan Letter. The rescission hearing was held on March 9, 1999, during which Plaintiff was represented by Beldock. Commr. Graber sat on the panel, and also testified as a witness against Plaintiff during the rescission hearing. (Pl. Ex. TT.) All three commissioners voted to rescind Plaintiff's parole, and Plaintiff received the Board's decision on March 11, 1999. Tracy also received a copy of the rescission hearing report. The decision indicated that the original release date was rescinded, parole was denied, and Plaintiff's next appearance would be in September, 2000. The decision stated that the Kindler and Keenan Letters were factors in the Board's determination to rescind parole.

### 4.    Legal Challenges to the Rescission Hearing

After Plaintiff's parole was rescinded, he sought administrative review of the Board's decision through the Appeals Unit of the DOP's Counsel's Office. While that appeal was pending, Plaintiff petitioned for a  writ of habeas corpus in Supreme Court, Wyoming County, in July, 1999, challenging the legality of his then-continuing detention. On September 27, 1999, Plaintiff's petition for writ of habeas corpus was dismissed without prejudice for failure to exhaust administrative remedies. (2d Am. Compl., Ex. A).

In November, 1999, the Board of Parole's Appeals Unit reversed the Board's decision to rescind Plaintiff's parole and directed that a new rescission hearing take place. (2d Am. Compl., Ex. B.) Prior to the new rescission hearing being conducted, Plaintiff renewed his habeas corpus petition in state court, and was granted relief in a

13

Memorandum and Order dated December 15, 1999.  Pursuant to that Memorandum and Order, Plaintiff was ordered released on parole "forthwith" by Acting Supreme Court Justice Mark H. Dadd. (Pl. Ex. NNNNN ("Dadd Decision").)

The DOP appealed the Dadd Decision to the Appellate Division, Fourth Department, which, on November 13, 2000, rendered an opinion reversing the decision below, finding that the writ had been prematurely granted and ordering that the Board conduct a second rescission hearing. People ex rel. Victory v. Herbert,  277 A.D.2d 933 (4th Dep't 2000). Leave to appeal that decision was denied on February 15, 2001, 96 N.Y.2d 705, rendering the Appellate Division's determination final, however, the DOP never implemented the order to schedule or conduct a second rescission hearing. Plaintiff was released to parole on December 28, 1999, and remained free until his parole violation some four months later.

According to the State Defendants, Gov. Pataki had initially heard about Plaintiff's parole from the news generated by the Dadd Decision in December, 1999. (Pataki Decl. ¶ 13.) Specifically, Pataki declared that he "had never heard of Albert Victory until a judge ordered that he be released in December of [1999]." (Id.) Pataki also testified that he was not aware of Plaintiff's first grant of parole in January, 1999, until the commencement of this lawsuit. (Pl. Ex. U (Pataki Dep.) at 35-36.)[8] Pataki recalls having been quoted in a newspaper article in December, 1999, regarding Plaintiff's release by judicial order, but is

---

[8] Plaintiff disputes at what point Pataki became aware of Plaintiff's release. Citing to Pataki's deposition, Plaintiff states that Pataki testified that "he had to assume that he knew Plaintiff had been granted parole on January 11, 1999." (Pl. Resp. to State Def. Stmt. (Docket No. 239) ¶ 131.). Pataki's testimony reads, "I have to assume, which I'm told not to do, that I did [know that Plaintiff had been granted release], but I have no recollection of what I knew or didn't know on January 11th of 1999. I'm not sure what the significance of that date is . . . . I still don't know what I would have known at that time." (Pl. Ex. U at 36.) Assuming Plaintiff has properly characterized the Governor's testimony, a witness' assumption is insufficient to give rise to a material issue of fact. See, e.g., U.S. v. Forbes, 740 F.Supp.2d 334, 341-42 (D.Conn. 2010).

uncertain as to when in 1999 he became aware of the Plaintiff's parole case and release.

### 5.    Parole Supervision in Utica, NY

When Plaintiff was released on parole pursuant to the Dadd Decision, the Board and parole officers imposed various conditions on Plaintiff, including periodic urine testing, abstaining from alcohol, electronic monitoring, seeking and maintaining employment, and identifying assets over $500.00. (State Def. Ex. F.) Dir. White declared that the special conditions of parole placed on Plaintiff "amounted to what [he] would call intensive parole supervision." (White Decl. ¶ 35.) Although the State Defendants claim that Hayden did not directly participate in arranging for the conditions of Plaintiff's parole, Hayden states that he "may have suggested possible conditions to Mr. White." (Hayden Decl. ¶ 20.). Hayden instructed his staff that Plaintiff be kept under close supervision, given the nature of the crime for which he was convicted and sentenced, as well as the fact that he had previously escaped from prison.

Hayden attended a meeting in New York City with Parole Officer Perritano to discuss Plaintiff's case with members of the DOP Special Services. Because the Dadd Decision ordered Plaintiff's immediate release, the DOP had less time than normal to prepare for Plaintiff's release to parole. Due to the shortened time period, Dir. White was directly involved in the preparations for Plaintiff's release, which included reviewing Plaintiff's central office file. Parole Officers Perritano and Chard were assigned to supervise Plaintiff out of DOP's Utica Office.

At that time Plaintiff indicated that he wished to live with his girlfriend, Susan Black, however, DOP had information that Ms. Black had a prior criminal record of her own, and was involved in Plaintiff's prison escape in 1978. Additionally, the State Defendants claim

that there were questions as to Ms. Black's source of income, and DOP thus requested information regarding any assets jointly held by Plaintiff and Ms. Black.  According to the State Defendants, the inquiry into Ms. Black's financial information was based on the concern that Plaintiff not reside with an individual who has been involved in illicit activity, as it would jeopardize Plaintiff's chances at leading a law-abiding life. If Ms. Black were to financially support Plaintiff, the DOP's policy is to be apprised of the source of the parolee's financial support. (Chard Decl. ¶ 9; Hayden Decl. ¶ 27-28; Perritano Decl. ¶ 8; Smith Decl. ¶ 11-12; White Decl. ¶ 34.) Further, Supr. Smith declared that Plaintiff would not be able to reside with Ms. Black unless the source of her income were disclosed, as she had no visible means of support. (Smith Decl. ¶ 11.) A September, 1996 Inmate Status Report indicates that Plaintiff intended to work for Ms. Black performing paralegal services if released on parole. (Pl. Ex. CCC.) It appears from the record that the  issue regarding Ms. Black's financials was never resolved.

While Plaintiff resided in Ms. Black's home, Parole Officer Perritano routinely visited with him, as home visits are a common method of supervising parolees. Plaintiff was also required to obey a curfew. Neither Ms. Black nor Plaintiff ever complained to Supr. Smith of inappropriate conduct by DOP personnel during the home visits.

At one point, Perritano obtained a sample of Plaintiff's urine, which, according to Perritano, field tested positive for cocaine.[9] (Chard Decl. ¶ 11; Hayden Decl. ¶ 29; Perritano Decl. ¶ 10; Smith Decl. ¶ 17.) Plaintiff disputes that his drug test came back positive, and

---

[9] Perritano's declaration states that the first urine sample was taken by an employee of DOCCS. (Perritano Decl. ¶ 10.) Smith's declaration, on the other hand, states that Plaintiff's first urine screen was taken on-site at the DOP Office. (Smith Decl. ¶ 17.)

submits Perritano's parole notes indicating that Plaintiff tested positive for opiates and not cocaine. (Pl. Ex. NNN (Chrono. Notes) dated 1/6/00.))

Following the allegedly positive drug screen, Plaintiff was detained and handcuffed. According to the State Defendants, Supr. Smith was present in the Parole Office on that date and was informed of Plaintiff's positive test result. Smith contacted Dir. White to advise him of the same. Dir. White, in turn, contacted Hayden, who then contacted the Executive Director of DOP. (Chard Decl. ¶ 11-12; Hayden Decl. ¶ 29; Perritano Decl. ¶ 11-12; Smith Decl. ¶ 17, 19; White Decl. ¶ 37.) Plaintiff disputes the chain of communication, stating that Smith reported the result to Hayden, who personally notified Dir. White, and afterward the Executive Director of DOP was advised of the test result. (Smith Decl. ¶ 17; Pl. Ex. P (Hayden Dep.) at 12-127; Pl. Ex. HH (White Dep.) at 65-67.)

Supr. Smith stated that he "notified by [sic] Regional Office that we might have a problem with a screen." (Smith Decl. ¶ 17.) Specifically, there was a "discrepancy" with the first test, and, upon the urine being tested again, the same discrepancy appeared in the second test. A third test was ordered, which yielded the same problematic results. (Smith Decl. ¶¶ 17-18, 20.)  The parole notes that indicate that Plaintiff tested positive twice and then negative before a full lab test was ordered. (Pl. Ex. NNN.). Specifically, the parole log notes, "(–) for opiates slight positive amphetamines maybe due to penicillin [unintelligible]." (Id.)

Plaintiff's initial drug screens apparently yielded inconclusive results due to a technical problem with the screening equipment. (Smith Decl. ¶¶ 17-18, 20.) Due to these discrepancies, a full lab test was authorized by either Smith or White at Beldock's request. In the interest of expediency, Plaintiff was taken to a hospital near Utica, New York, for yet

17

another urinalysis, in lieu of sending Plaintiff's specimen to New York City for independent laboratory testing. The hospital screen came back negative. Following the negative result of the independent laboratory test, Plaintiff was released and no violation warrant was issued against him.

Parole Officers Chard and Perritano, and Supr. Smith all deny that they threatened Plaintiff during the urine testing incident. (State Def. Stmt. ¶¶ 175-177.) The portion of Plaintiff's deposition testimony that he relies on in disputing this fact does not indicate that Chard, Perrtaino, or Smith threatened Plaintiff, but that several parole officers (including those who are not parties in this action) were "laughing and celebrating [Plaintiff's violation]." Plaintiff could not recall what specifically was said, however. (Pl. Ex. NN (Victory Dep.) at 166-169.)

After one month of being supervised out of the Utica DOP Office, Plaintiff requested that he be allowed to move to Syracuse. His request was approved, and his parole supervision was transferred from Utica to the Syracuse DOP Office. Neither Chard nor Perritano supervised Plaintiff after he relocated to Syracuse. Smith, Chard, and Perritano all determined that Plaintiff's performance while being supervised on parole by the Utica DOP Office was satisfactory.

### 6.    Transfer to Syracuse

When Plaintiff arrived in Syracuse in January, 2000, he resided in an apartment at the Regency Towers, and later moved to a two-bedroom house at 104 Lacy Place, Syracuse, New York. Parole Officer McCarthy was responsible for Plaintiff's supervision in Syracuse.  Plaintiff was McCarthy's only parolee under his supervision at the time.

When Plaintiff relocated, he was given new special conditions of release to parole

18

supervision, which he acknowledged and signed. Such conditions included, among other things, that Plaintiff abstain from use and possession of alcoholic beverages, not to enter any establishment where alcohol is served or sold for on-site consumption, and to fully comply with all motor vehicle and traffic laws. (Syr. Def. Ex. (Docket No. 230) D.) Syracuse parolees had similar parole conditions, including the prohibition of alcohol consumption, and at no time did Parole Officer McCarthy give Plaintiff permission to drink alcohol. Although Commr. Graber testified that the language prohibiting Plaintiff from entering a bar as a special condition might be considered "over-inclusive," it is not disputed among the parties that a restriction of that nature is a common one placed on parolees. (Pl. Ex. V (Graber Dep.) at 96-98; Hayden Decl. ¶ 33.)

Parole Officer McCarthy was not aware of Plaintiff's case prior to supervising Plaintiff on parole. Once McCarthy was assigned to supervise Plaintiff, he contacted various individuals, including Parole Officer Perritano in Utica, to acquaint himself with Plaintiff's circumstances. As part of his supervision in Syracuse, Plaintiff was subject to electronic monitoring to allow McCarthy to be notified if Plaintiff was outside of his home without permission. McCarthy would also conduct home visits and surveillance of Plaintiff and contact Plaintiff at least once a week. According to Hayden and McCarthy, Robert Kent of DOP had decided to place a tracking device on the Plaintiff's vehicle. It is unknown whether that device was ever placed. (Pl. Ex. P (Hayden Dep.) at 150-151; Hayden Decl. ¶ 34; McCarthy Decl. ¶ 22.)

Parole Officer McCarthy contacted the Syracuse Police Department ("SPD") as well as other local law enforcement agencies regarding Plaintiff, and provided the SPD with descriptions of Plaintiff's vehicles. The parties do not dispute that contact with law

enforcement is an accepted method of aiding a parole officer in supervising parolees.

On March 16, 2000, a Mug Shot Profile Parole Flyer ("Parole Flyer") of Plaintiff was printed out and read off at roll call to SPD officers. The Parole Flyer is an informational printout created using a computer program called "ONIS," and contains a description of the parolee, details of his or her parole, and a description of any vehicles driven by the parolee. SPD officers in the Criminal Investigations Division use ONIS to create Parole Flyers based upon the information given to the SPD by the New York State DOP. SPD Officer Murfitt recalled that he obtained his copy of Plaintiff's Parole Flyer at some point before or after roll call, where copies of mug shot profiles would generally be made available. (Syr. Def. Ex. O (Murfitt Dep.) at 10-11.)

Parole Officer McCarthy advised SPD Detective James Quatrone, who was conducting Plaintiff's surveillance, that consumption of alcohol could be a violation of his parole, and wanted Quatrone to observe whether Plaintiff was consuming alcohol. McCarthy gave the SPD a photograph of Plaintiff, as well as information about Plaintiff's vehicles, including a Jeep Wrangler. McCarthy subsequently requested assistance from the SPD Criminal Investigation Division, Selective Enforcement Section,[10] to conduct surveillance of Plaintiff one evening in 2000.

Sometime prior to April 7, 2000, SPD Officers Murfitt and Gilhooley went to the Regency Towers parking garage to view Plaintiff's Jeep Wrangler. The two officers took note of the license plate number and left. They did not search Plaintiff's vehicle, nor did they touch the vehicle according to the Regency Tower's parking garage attendant. The

---

[10] The role of the Selective Enforcement Section is to investigate major crime and criminals.

Regency Towers parking garage is open to the public and is not exclusive to the tenants of the building. (Syr. Def. Ex. T (Peletski Dep.) at 14, 25.)  Murfitt and Gilhooley testified that they did not place a tracking device on Plaintiff's Jeep Wrangler, and there is no evidence in the record that demonstrates otherwise.

### 7.    Parole Violation

On the evening of April 7, 2000, Plaintiff went to the Bottom Line, a gentlemen's club or "strip club" in Syracuse, New York. There, Plaintiff ordered a beer and other alcoholic beverages for the himself, the owner, the bartender, and some of the patrons. While surveilling Plaintiff, Murfitt and Gilhooley observed Plaintiff's vehicle parked outside of the Bottom Line. Based upon the suspicion that Plaintiff was inside, and that he was not permitted to be in a bar under the terms of his parole, the two officers entered the Bottom Line and saw Plaintiff with a beer and a plate of food in front of him. Murfitt and Gilhooley asked Plaintiff if the Jeep Wrangler parked outside was his, and Plaintiff acknowledged that it was. The three men then stood outside of the bar for approximately five minutes while Plaintiff provided his identification and answered questions for the officers.

According to the Syracuse Defendants, Gilhooley asked Plaintiff to move his vehicle. After receiving his identification back, Plaintiff re-entered the Bottom Line and asked another patron to move his Jeep for him. (Syr. Def. Ex. P (Gilhooley Dep.) at 45.) Plaintiff disputes this series of events, claiming that he preemptively had another patron move his vehicle prior to speaking with the police so he would not be arrested for driving while intoxicated. (Pl. Ex. NN (Victory Dep.) at 230-234.)

Murfitt and Gilhooley then attempted to contact Parole Officer McCarthy, who met the two officers outside of the Bottom Line. In the interim, Plaintiff had left the club through

21

the back door, which was approximately fifty yards away from his house on Lacy Place.[11]
At the Bottom Line, McCarthy spoke with the bartender, who told him that she had served
Plaintiff eight or nine beers. (McCarthy Decl. ¶ 31.) McCarthy's case summary also
indicates that he had spoken with the proprietor of the Bottom Line, and that she was
uncooperative. (Pl. Ex. PPPPP.)

After learning that Plaintiff was no longer inside the club, McCarthy provided the two
police officers with Plaintiff's address, and that information was broadcast to Syracuse
police.  Shortly thereafter, Plaintiff was in his driveway when he was approached by Murfitt
and Gilhooley. The two officers then conducted an interview of Plaintiff, in which Plaintiff
admitted to drinking alcohol at the Bottom Line. Plaintiff took an alcosensor test, which
indicated that Plaintiff had alcohol on his breath.  McCarthy also stated then when he
spoke with Plaintiff at his home and asked Plaintiff to exhale, McCarthy detected the odor
of alcohol. Later, Plaintiff was administered a breathalyzer test, which also indicated that
Plaintiff had consumed alcohol. Plaintiff does not dispute that the breath test confirmed that
he had been consuming alcohol, and he does not deny that he had been drinking that night
at the Bottom Line.

Parole Officer McCarthy contacted DOP Syracuse Office Supervisor Robert Kent
and advised him as to what had occurred. Kent determined that a parole warrant could be
issued for Plaintiff and approved the issuance of a parole warrant for Plaintiff for his
consumption of alcohol at the Bottom Line. McCarthy directed SPD Officers Murfitt and
Gilhooley to take Plaintiff into custody based on his violation of the terms of his parole.

---

[11] Plaintiff does not explain why, despite living so close to the Bottom Line, he elected to drive his
vehicle there and park it outside the bar.

Plaintiff was taken to the SPD Criminal Investigations Division, where he met with Syracuse DOP officials and Parole Officer McCarthy.   A parole warrant was prepared and issued, authorizing Plaintiff to be placed in detention and lodged in the Onondaga County Justice Center. McCarthy and another parole officer charged Plaintiff with violating the conditions of his parole by being inside the Bottom Line, an establishment where alcohol is served or sold for on-site consumption and by using, possessing, and consuming alcohol on April 7, 2000. Plaintiff was then booked into the Onondaga County Justice Center.

On April 10, 2000, Plaintiff was issued a Notice of Violation/Violation of Release Report charging that on April 7, 2000, he violated the conditions of his release when he entered an establishment that served alcohol, and had consumed alcoholic beverages therein. Plaintiff admitted under oath that he did consume alcohol on April 7, 2000.

### 8.    Legal Challenges to the Revocation Hearing

Following his preliminary parole revocation hearing on April 26, 2000, Plaintiff attempted to challenge the legality and admissibility of the evidence that he was consuming alcohol. The state court rejected Plaintiff's argument. People ex rel. Victory v Travis, 288 A.D.2d 932 (4th Dep't 2001), lv. denied, 97 N.Y.2d 611. During this time period the Dadd Decision releasing Plaintiff on parole was pending on appeal, and was later overturned in November, 2000  by the Appellate Division, Fourth Department, which directed that a new rescission hearing be held. People ex rel. Victory v. Herbert, 277 A.D.2d 933 (4th Dep't 2000). Since Plaintiff had been re-incarcerated in the meantime as a result of his parole violation, the issue regarding the rescission hearing had become moot, and no re-hearing was held.

Plaintiff's parole was revoked following a final hearing on March 26, 2002. The

hearing officer recommended a hold of twenty-eight months, which was later modified by a parole commissioner on May 29, 2002 to a hold of 60 months. (Pl. Ex. JJJJJ.) The parole revocation and time assessment were affirmed by the Board's Appeals Unit in July, 2003. (Pl. Ex. KKKKK.)   In the spring of 2004, the Parole Board conducted a full review of Plaintiff's parole revocation and sentence pursuant to 9 N.Y.C.R.R. § 8005.21, and affirmed the 60-month sentence.

Plaintiff also challenged the parole revocation in Clinton County Supreme Court by way of a petition for writ of habeas corpus. (Pl. Ex. MMMMM.) Plaintiff's petition was converted into an Article 78 proceeding and was granted to the extent that the 60-month time assessment was deemed excessive. (Pl. Ex. LLLLL.) In a written Decision and Judgment, Acting Supreme Court Justice Feldstein held that: (1) Plaintiff's admitted conduct supported a violation of parole, (2) Plaintiff's contention of selective enforcement lacked merit, and (3) the 60-month time assessment was disproportionate to Plaintiff's parole violation and must be shortened. (Pl. Ex. LLLLL ("Feldstein Decision") at 12-13, 16, 22.)  Because Plaintiff had already served a majority, if not all of the 60-month delinquent time assessment, Feldstein ordered that Plaintiff immediately be considered for re-release. (Id. at 22.) On September 6, 2005, Plaintiff was considered for re-release and was released on parole on October 18, 2005.

### 9.    Federal Proceedings

While Plaintiff was in DOCCS custody and awaiting the outcome of his parole revocation decision in state court, Plaintiff filed a complaint in this Court on January 10, 2002 (Docket No. 1), and an amended complaint on March 28, 2002 which alleged that Plaintiff was the victim of an illegal conspiracy (a) to continue to incarcerate him based on

his crime of conviction and Gov. Pataki's political agenda; (b) to improperly rescind his January 11, 1999 grant of parole by manufacturing a false premise for its rescission; and, when he was granted release by the Wyoming County Supreme Court, (c) to impose unnecessary and extreme conditions on his parole in order to effectuate a parole violation, and to pursue him relentlessly in order to locate an opportunity to prosecute him for a parole violation. (Docket No. 17.)

On December 23, 2002, the second and third causes of action in the amended complaint advancing claims of conspiracy under 42 U.S.C. §§ 1985 and 1986 were dismissed outright, as were the claims against Defendants Keenan and Kindler. (Docket No. 51.) On July 31, 2003, this Court granted the State Defendants' motion to dismiss in part, dismissing Plaintiff's claims for damages against the State Defendant in their official capacities, as well as the claims against Defendant Graber with respect to his conduct during the March, 1999 rescission hearing.  (Docket No. 68.)

Plaintiff filed a second amended and supplemental complaint ("2d Am. Compl.") on February 14, 2008, which contains five causes of action alleging various constitutional violations by all of the defendants pursuant to 42 U.S.C. § 1983, violations by all of the defendants under the New York State Constitution, selective and malicious prosecution by all of the defendants, and negligence of the individual defendants and the City of Syracuse. (2d Am. Compl. (Docket No. 162) ¶¶ 101-133.)  The second amended complaint is the operative pleading here.

Both the State and Syracuse Defendants now bring motions for summary judgment seeking dismissal of the second amended complaint. (Docket Nos. 228, 230.) For the reasons that follow, both motions are granted, and the second amended complaint is

dismissed in its entirety.

## III. DISCUSSION

### A.    General Principles of Law

### 1.    Summary Judgment

Rule 56 of the Federal Rules of Civil Procedure provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A fact is "material" only if it "might affect the outcome of the suit under governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A "genuine" dispute exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Id. In determining whether a genuine dispute regarding a material fact exists, the evidence and the inferences drawn from the evidence "must be viewed in the light most favorable to the party opposing the motion." Adickes v. S.H. Kress & Co., 398 U.S. 144, 158–59 (1970) (internal quotations and citation omitted).

"Only when reasonable minds could not differ as to the import of evidence is summary judgment proper." Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991) (citation omitted). Indeed, "[i]f, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper." Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 82–83 (2d Cir. 2004) (citations omitted). The function of the court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249.

2.      42 U.S.C. § 1983

Civil liability is imposed under 42 U.S.C. § 1983 only upon persons who, acting under color of state law, deprive an individual of rights, privileges, or immunities secured by the United States Constitution and federal law. See 42 U.S.C. § 1983. On its own, § 1983 does not provide a source of substantive rights, but rather, a method for vindicating federal rights conferred elsewhere in the federal statutes and Constitution. See Graham v. Connor, 490 U.S. 386, 393–94 (1989) (quoting Baker v. McCollan, 443 U.S. 137, 145 n. 3 (1979)).

B.    State Defendants' Motion

The State Defendants move for summary judgment on the grounds that: (1) Defendants Pataki and Graber were not personally involved with the alleged constitutional deprivations; (2) Plaintiff's § 1983 claims fail as a matter of law; (3) Plaintiff's New York constitutional claims fail as a matter of law; (4) the complaint is untimely with respect to the intentional torts claims; (5) the state law causes of action are statutorily barred; (6) Plaintiff's negligence claim fails as a matter of law; and (7) the Defendants responsible for Plaintiff's parole supervision are entitled to absolute immunity. (State Def. Mem. (Docket No. 282-2 at 4-20.) Plaintiff has opposed the motion. (Docket No. 239, 241.)

For the reasons that follow, the State Defendants' motion is granted.

1.    Heck Doctrine

On the outset, the Court must address Plaintiff's contention that the causes of action in the second amended complaint relating to his parole revocation are still pleaded in this action. (Pl. Mem. (Docket No. 239) at 30.)

In its Decision and Order dated July 31, 2003 (Docket No. 68), this Court dismissed Plaintiff's causes of action for damages relating to the revocation of parole pursuant to Heck v. Humphrey, 512 U.S. 477 (1994). (Docket No. 68 at 12-15, 32.) Heck states that "[i]n order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus." Heck, 512 U.S. at 486–87, 114. In accordance with the Heck rule, this Court precluded Plaintiff's claims arising out of the parole revocation process on the ground that Plaintiff's revocation determination had not yet been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal, or called into question by a Federal Court's issuance of a writ of habeas corpus. (Docket No. 68 at 15.)

Plaintiff now urges the Court to consider his parole revocation claims because he has since "exhausted his administrative remedies and successfully petitioned for a writ of habeas corpus, which was issued in March 2005 to the extent the state court determined plaintiff's assessment was two years too long." (Pl. Mem. at 30.) The Court agrees with the State Defendants that Plaintiff's argument is unavailing because he fails to demonstrate a favorable termination in order to bypass the Heck bar. (State Def. Mem. at 4-7.)[12]

On March 9, 2005 Acting Supreme Court Justice Peter Feldstein in Clinton County

---

[12] Plaintiff also appears to suggest that this Court dismissed his claims without prejudice for non-exhaustion. This is not so. (Docket No. 68 at 14-15.)

Supreme Court reviewed Plaintiff's habeas corpus petition requesting that the results of the final parole revocation hearing be overturned and that he be re-released to parole supervision. The Feldstein Decision, dated March 9, 2005 (Pl. Ex. LLLLL ), rejected each of Plaintiff's arguments relating to the manner and procedure of the revocation of Plaintiff's parole. See Victory v. Travis, et al., Supreme Court, Clinton County, Index No. 03-1115, dated 3/9/2005. Feldstein did, however, find that the parole commissioner's 60-month delinquent time assessment imposed on Plaintiff was disproportionate to his parole violation offense. Plaintiff's habeas corpus petition was converted to an Article 78 proceeding, and granted only to the extent that the 60-month time assessment was shortened. Plaintiff was ordered to be considered for re-release to parole supervision as a result of the Feldstein Decision. Id.[13]

Notwithstanding this outcome, the challenges Plaintiff raised to the legitimacy of the parole revocation proceeding itself were considered and rejected by Feldstein, including Plaintiff's contentions that the determination supporting the parole violation charges was unsupported by the record, arbitrary and capricious, and constituted an abuse of discretion. Notably, the Feldstein Decision emphasized the distinction between challenging the DOP's burden of proof and challenging the appropriateness of the sanction imposed. (Pl. Ex. LLLLL at 6-11.)  Because the effect of Plaintiff's Article 78 proceeding was simply to shorten the delinquent time assessment, and not to reverse, expunge, or invalidate Plaintiff's original revocation hearing determination, the Heck bar remains in tact.  See

---

[13] In light of the fact that as of March 9, 2005, Plaintiff would have already been eligible to be considered for re-release to parole supervision under the 60-month time assessment, the Court found that "no purpose would be served in remanding this matter for a new delinquent time assessment at this time." (Pl. Ex. LLLLL at 22.)

Wilkinson v. Dotson, 544 U.S. 74 (2005) ("Heck specifies that a prisoner cannot use §
1983 to obtain damages where success *would necessarily* imply the unlawfulness of a (not
previously invalidated) conviction or sentence.")

Despite Plaintiff's assertions to the contrary, the Feldstein Decision does not
constitute a favorable termination for purposes of Heck, and any claims arising out of the
parole revocation proceedings remain dismissed.

### 2.    Personal Involvement

The State Defendants argue that Gov. Pataki was not personally involved in the
events surrounding Plaintiff's parole grant, rescission, violation, and revocation. (State Def.
Mem. at 4-6.)

In order to recover under § 1983, Plaintiff must establish the personal involvement
of each defendant in the alleged constitutional deprivations. Hernandez v. Keane, 341 F.3d
137, 144 (2d Cir. 2003), cert. denied, 543 U.S. 1093 (2005); Wright v. Smith, 21 F.3d 496,
501 (2d Cir. 1994). Personal involvement may be shown where the defendant directly
participated in the violation, or, if the defendant was a supervisory employee or official,
where the defendant: (1) failed to remedy the violation after it was brought to his attention;
(2) created or fostered a policy or custom that allowed or caused such violations to occur;
(3) was grossly negligent in supervising subordinates who committed the violation; or (4)
showed deliberate indifference to the rights of others by failing to act on information that
constitutional violations were occurring. See Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir.
1995); Henry v. Lempke, 680 F.Supp.2d 461, 464 (W.D.N.Y. 2010).

The Second Circuit has clarified the meaning of "direct participation" for purposes
of determining personal involvement in § 1983 cases. In Provost v. City of Newburgh, 262

F.3d 146, 155 (2d Cir. 2001), the circuit court held that "'direct participation' as a basis of liability in this context requires intentional participation in the conduct constituting a violation of the victim's rights by one who knew of the facts rendering it illegal." Here, it is undisputed that Pataki had no involvement in events in connection with Plaintiff's rescission hearing, parole supervision, or revocation proceedings, and was not even aware of Victory's case until his court-ordered release in December, 1999.

To the extent Plaintiff seeks to argue that Pataki  created a policy or custom under which unconstitutional practices occurred, this argument also fails because there is no evidence in the record that Pataki's established anti-crime position, particularly his view that violent felons should not be granted parole, was ever implemented as a policy set forth by the DOP. Plaintiff fails to present any admissible evidence of a connection between Pataki and Plaintiff's parole history beyond mere conjecture, and thus Plaintiff's claims against Pataki must be dismissed for lack of personal involvement. See  Kulak v. City of N.Y., 88 F.3d 63, 71 (2d Cir.1996) ("[C]onclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment.").

### 3.    § 1983 Claims

Plaintiff's advances a panoply of constitutional violations under 42 U.S.C. § 1983, including deprivations of due process, equal protection, and right to be free from unreasonable searches and seizures in connection with his rescission hearing,  parole supervision, and parole revocation.  (2d Am. Compl. ¶¶ 102-119.)

Because the claims arising out of Plaintiff's parole revocation have previously been dismissed by this Court, see Discussion at III.B.1, only the § 1983 claims relating to his rescission hearing and parole supervision remain on this motion for summary judgment.

The Court discusses those claims in turn.

### a.    Due Process

Plaintiff alleges that the State Defendants violated his rights to procedural and substantive due process because he was deprived of an unbiased panel at his parole rescission hearing. (Pl. Mem. (Docket No. 239) 17-21.)

Procedural due process claims have two elements. First, there must exist a liberty or property interest which has been interfered with by the state. Second, the plaintiff must show that the procedures which led to the deprivation were constitutionally deficient. Kentucky Dep't of Corr. v. Thompson, 490 U.S. 454, 460 (1989); Bedoya v. Coughlin, 91 F.3d 349, 351-52 (2d Cir. 1996). The Second Circuit has explained that, with respect to parole revocation,

> [T]he Supreme Court has held that due process requires: "(a) written notice of the claimed violations of parole; (b) disclosure to the parolee of evidence against him; (c) opportunity to be heard in person and to present ... evidence; (d) the right to confront and cross-examine adverse witnesses ...; (e) a 'neutral and detached' hearing body such as a traditional parole board ...; and (f) a written statement by the factfinders as to the evidence relied on and reasons for revoking parole."

Friedl v. City of N.Y., 210 F.3d 79, 84-85 (2d Cir. 2000) (quoting Morrissey v. Brewer, 408 U.S. 471, 489 (1972)). The Second Circuit has extended such protections, with limitations not relevant to the instant analysis, to the rescission of parole. Drayton v. McCall, 584 F.2d 1208, 1219–20 (2d Cir. 1978); Green v. McCall, 822 F.2d 284, 288–89, 291 (2d Cir. 1987); Rizo v. Smith, No. 99-CV-0188, 2004 WL 2360039, at *2 (W.D.N.Y. Oct. 20, 2004) (citing Drayton, 584 F.2d at 1219-20). Additionally, New York regulations governing parole releases provide an inmate undergoing a rescission hearing the rights to be represented

by counsel, to appear and speak on his own behalf, to present and confront witnesses and to introduce documentary evidence. Id. (citing 9 N.Y.C.R.R. § 8002.5(b)(5)).

The Court acknowledges, and as the state courts have repeatedly pointed out,  that the conduct of Plaintiff's rescission hearing is problematic on a due process level. (Pl. Ex. NNNNN.) Fatal to Plaintiff's claim, however, is the fact that all of the potential unconstitutional acts stem from one individual, Commr. Graber, who has previously been held immune from suit on the ground of absolute judicial immunity for his actions during the rescission hearing.  (Docket No. 68 at 19-23.) Thus, while there arguably exist issues of fact with regard to whether Graber knew of the escape and therefore whether the information that his rescission hearing was based upon was "new" for purposes of 9 N.Y.C.R.R. § 8002.5(b)(2)(i), Graber's conduct is no longer at issue, and Plaintiff cannot maintain a constitutional claim arising out of his actions. Assuming the rescission hearing deprived Plaintiff of his rights to due process, he nonetheless cannot establish personal involvement of the other named defendants in this action because they did not directly participate in the rescission hearing, see Colon, 58 F.3d at 873,[14] and, as discussed below, Plaintiff has not presented adequate evidence to support an inference that an improper conspiracy took place. See Discussion at III.B.3.c.

Accordingly, Plaintiff's due process claim must be dismissed.

### b.    Equal Protection

In the second amended complaint, Plaintiff contends that his rights to equal

---

[14] Although personal involvement can still be found without direct participation if the defendant occupies a supervisory position, see Williams v. Smith, 781 F.2d 319, 323-24 (2d Cir. 1986), Plaintiff does not allege or offer any evidence to support a finding that Commr. Graber acted in any supervisory capacity with respect to the other State Defendants.

protection were violated by the State Defendants when the DOP rescinded Plaintiff's parole. (2d Am. Compl. ¶¶ 103-107.)

"The Equal Protection Clause of the Fourteenth Amendment requires the government to treat similarly situated persons alike." Missere v. Gross, 826 F.Supp.2d 542, 560 (S.D.N.Y. 2011). Because Plaintiff does not allege to be a member of a protected class, he may proceed under one of two equal protection theories, selective enforcement or "class-of-one." Id.

To successfully plead an equal protection claim, a plaintiff must assert that he was treated differently from similarly situated individuals and either (i) that "such differential treatment was based on impermissible considerations such ... as a malicious or bad faith intent to injure a person" ("selective prosecution" equal protection) or (ii) that there was "no rational basis for the difference in treatment" ("class-of-one" equal protection), Cobb v. Pozzi, 363 F.3d 89, 110 (2d Cir. 2004). With respect to the rescission proceedings, Plaintiff appears to press a "class-of-one" equal protection claim. (Pl. Mem. at 25.)

Plaintiff cannot establish the elements of a class-of-one equal protection claim on this record. He states, in conclusory fashion, that he was not treated like other parole grantees or parolees (Pl. Mem. at 27), but fails to identify any other individuals to whom he was similarly situated.  See MacPherson v. Town of Southampton, 738 F.Supp.2d 353, 371 (E.D.N.Y. 2010) (dismissing the plaintiffs' equal protection claim—"whether pled as a selective enforcement claim or a class-of-one claim" because the complaint failed to "identify any comparators or similarly situated entities at all").

Further, the only evidence Plaintiff submits in support of his allegation that he was treated differently from other A-1 felons generally is the deposition testimony of the various

witnesses in this case, all of whom stated that Plaintiff's case was high-profile and/or unusual. (Pl. Ex. L (Lapp Dep.) at 90-91; Pl. Ex. Q (Tracy Dep.) at 109, 133-34; Pl. Ex. V (Graber Dep.) at 26-27; Pl. Ex. Y (Molik Dep.) at 116.)) This does not give rise to an issue of fact that Plaintiff was treated differently than other individuals without a rational basis–it only proves that Plaintiff's case drew attention from DOP officials and others involved in Plaintiff's prosecution. It is worth noting that Plaintiff is not the only inmate that has been the subject of a parole rescission hearing and the rescission hearing under these circumstances cannot be said to constitute differential treatment. See generally, Rizo v. Smith, No. 99-CV-0188, 2004 WL 2360039 (W.D.N.Y.  Oct. 20, 2004); Krebs v. N.Y. State Div. of Parole, No. 9:08-CV-255, 2009 WL 2567779 (N.D.N.Y.  Aug. 17, 2009); 9 N.Y.C.R.R. § 8002.5(b)(2)(i) ("Events which may cause the temporary suspension and rescission of a parole release date shall include, but not be limited to . . . (i) significant information which existed, or significant misbehavior which occurred prior to the rendition of the parole release decision, where such information was not known by the board. . .")

Accordingly, Plaintiff's equal protection claim fails as a matter of law and is subject to dismissal.

Likewise, Plaintiff's "selective enforcement" claim relating to his parole supervision is woefully deficient. (2d Am. Compl. ¶¶ 111-115). Plaintiff presents no admissible evidence that he was subject to a higher level of supervision than other parolees, does not specifically allege that he was treated differently from similarly-situated inmates, and names no comparators.

Most importantly, Plaintiff does not identify any similarly-situated individuals, let alone any similarly-situated parolees that were treated differently. As a result, Plaintiff's

equal protection claim must fail as matter of law. See, e.g., MacPherson, 738 F.Supp.2d at 371.

Furthermore, abstaining from alcohol, contrary to Plaintiff's assertion, is not a heightened standard for a parolee, and it was within the discretion of his Parole Officer to impose such a special condition.  See, e.g., Ahlers v. N.Y. State Div. Of Parole, 1 A.D.3d 849 (3rd Dep't 2003) ("The imposition of a special condition upon the release of an inmate is discretionary in nature . . . ."); N.Y. Exec. L. § 259–i; 9 N.Y.C.R.R. §  8003.2; see also, e.g., Cusamano v. Alexander, 691 F.Supp.2d 312 (N.D.N.Y. 2009) (no due process violation where parolee's special conditions included curfew, mandatory participation in drug and alcohol treatment programming, travel limitations, and prohibition against frequenting establishments that serve alcohol).  Plaintiff submits only his own speculation that other parolees "that were buying drugs were treated less harshly than me on a standard basis." (Pl. Ex. NN (Victory Dep.) at 263.) A bare accusation such as this cannot defeat a motion for summary judgment. Berger v. Schmitt, No. 02-CV-0155, 2003 WL 21383007, at *6 (W.D.N.Y. Apr. 18, 2003) ("[C]onclusory accusations by themselves are insufficient to defeat a properly supported motion for summary judgment.")

Moreover, the Supreme Court has stated that, "[i]n our criminal justice system, the Government retains 'broad discretion' as to whom to prosecute." Wayte v. U.S., 470 U.S. 598, 607 (1985) (quoting U.S. v. Goodwin, 457 U.S. 368, 380, n. 11 (1982)) (other citations omitted).[15] "'[S]o long as the prosecutor has probable cause to believe that the accused

---

[15] For purposes of this case, there is no practical difference between a claim of selective enforcement and a claim of selective prosecution, since the State Defendants were involved in both the supervision of Plaintiff and the decision to violate his parole status, and the same analysis governs both types of claims.  See U.S. v. Barlow, 310 F.3d 1007, 1010 (7th Cir. 2002).

committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion.'" Id. (quoting Bordenkircher v. Hayes, 434 U.S. 357, 364 (1978)). While the decision to prosecute cannot be based on an unjustifiable standard, see id. at 608, such is not the case here. Plaintiff admits that his conduct violated the clear terms of his parole supervision by drinking several alcoholic beverages in a gentleman's club. Plaintiff has not provided the requisite "clear evidence" that McCarthy's decision to violate Plaintiff "had a discriminatory effect and that it was motivated by a discriminatory purpose." U.S. v. Armstrong, 517 U.S. 456, 465 (1996). To the contrary, Plaintiff's own testimony indicates his blatant disregard for his parole officer's authority, stating that he knew he was not permitted to go into a bar and drink alcohol, and did so anyway. Specifically, Plaintiff recalled, "I'm not going to even talk to [the officers], because if I even talk to them, I have to report that to Kevin McCarthy . . . . I might have had a couple beers. I don't want them to be able to say I'm drinking." He later admitted to Parole Officer McCarthy that he had been drinking at the bar and testified to the same under oath on multiple occasions. (Pl. Ex. NN (Victory Dep.) at 211-13, 232-33)

Finally, insofar as Plaintiff seeks to allege disparate treatment by any of the State Defendants based on his status as a violent felon (2d Am. Compl. ¶ 53),  the Second Circuit has recently rejected such a claim. Graziano v. Pataki, 689 F.3d 110 (2d Cir. 2012) (holding that alleged unofficial policy to deny parole to all violent felony offenders did not violate equal protection.); see also Blackett v. Thomas, No. 02 Civ. 9258, 2003 WL 21744080 (S.D.N.Y. July 14, 2003) (holding that plaintiff's status as violent felony offender was not an impermissible consideration motivating parole denial).

37

For these reasons, Plaintiff's equal protection claims must be dismissed.

### c.    Conspiracy

Plaintiff contends that the State Defendants conspired to deprive Plaintiff of his civil rights by entering an agreement to unlawfully rescind Plaintiff's parole. (Pl. Mem. at 28-29.)

To sustain a § 1983 conspiracy claim, a plaintiff must prove: "(1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." Pangburn v. Culbertson, 200 F.3d 65, 72 (2d Cir. 1999). An agreement must be proven with specificity and bare allegations of a conspiracy are insufficient. Gyadu v. Hartford Ins. Co., 197 F.3d 590, 591 (2d Cir. 1999). A plaintiff claiming conspiracy under § 1983 must also show that the defendants acted in a willful manner, culminating in an agreement, understanding, or meeting of the minds that violated the plaintiff's constitutional or statutory rights.  Jean–Laurent v. Wilkinson, 540 F.Supp.2d 501, 507–08 (S.D.N.Y. 2008). Conspiracies are "by their very nature secretive operations, and may have to be proven by circumstantial, rather than direct, evidence." Id. at 508 (quoting Pangburn, 200 F.3d at 72).

First, Plaintiff does not establish that an agreement took place among the State Defendants. To that end, the only evidence he presents are the communications between Defendants McGuire, Tracy, Grant, and non-party Lapp, as well as her discussions with non-parties Kindler and Keenan regarding Plaintiff's parole. The State Defendants do not dispute that such conversations took place, however, and Plaintiff presents no additional evidence that these individuals agreed to anything other than reviewing Plaintiff's parole file–the mere discussion of which does not give rise to an agreement for purposes of a §

1983 conspiracy claim. See San Filippo v. U.S. Trust Co., 737 F.2d 246, 256 (2d Cir. 1984) (holding that there was "nothing suspicious or improper" where defendants and the district attorney met and communicated on several occasions, when such meetings are "routine and necessary in the preparation of evidence," and that the "mere allegation of their occurrence is [not] sufficient to create a material issue of fact as to whether something improper took place during them . . . ."); see also Zahrey v. City of N.Y., No. 98–CV–4546, 2009 WL 1024261, at *11 (S.D.N.Y.  Apr. 15, 2009) (dismissing conspiracy claim where plaintiff "provide[d] no evidence, absent the fact that the Individual Defendants worked together, that . . . an agreement existed").

Second, even assuming that the State Defendants agreed to hold a rescission hearing, Plaintiff cannot show that the State Defendants acted in concert to achieve an unconstitutional injury. It is undisputed that ADA Kindler and Judge Keenan did oppose Plaintiff's parole, and wrote letters to that end for submission at the rescission hearing, which those individuals were entitled to do and is a typical part of the parole review process.  That the letters arrived after-the-fact is of no moment. See Ortiz v. N.Y. State Bd. of Parole, 239 A.D.2d 52 (4th Dep't 1998).   Likewise, the involvement of Lapp, Travis, Grant, and Tracy, was rooted in their job functions and there is nothing unlawful or unconstitutional about the rescission process itself. See Ortiz, 239 A.D.2d at 55 ("The purpose of a rescission hearing is to correct a mistake in the initial determination to grant parole before an inmate is released."); see also 9 N.Y.C.R.R. § 8002.5 (Providing that, "[a]fter an inmate has received a parole release date, situations may arise which would cause the board to reconsider its decision to grant parole release.")

The potential due process violation that is present on this record occurred during

Plaintiff's rescission hearing and arose from Commr. Graber's conduct in sitting on the panel while providing unsworn testimony against Plaintiff at the same hearing. Yet there is no nexus between Lapp, Kindler, Keenan, Grant, Travis, and Tracy discussing Plaintiff's parole file and Graber depriving Plaintiff of an impartial hearing. There is no evidence on the record that any of the State Defendants either assigned Graber to the rescission panel or knew that Graber would be assigned to the rescission panel. Here, Plaintiff points only to the fact that the State Defendants and non-party witnesses provided inconsistent testimony with regard to the order in which they spoke to one another and how the issue of the escape was characterized during those conversations. This is immaterial. Not one witness testified that Graber was previously aware of Plaintiff's escape history and there is nothing in the record to contradict Graber's assertion that he made a critical oversight in Plaintiff's parole proceeding. In fact, all of the testimony corroborates that Graber's failure to note the escape in the parole file when it was readily available was nothing more than a mistake.

To succeed on his conspiracy claim, Plaintiff must show that the State Defendants "acted in a willful manner, culminating in an agreement, understanding or 'meeting of the minds,' that violated his rights, privileges, or immunities secured by the Constitution or federal courts." See Shabazz v. Pico, 994 F.Supp. 460, 467 (S.D.N.Y. 1998) (quotations and citations omitted). Plaintiff has failed to do so here. What this case does demonstrate, though, is a series of mishaps and oversights on behalf of the State Defendants and a botched attempt by a Parole Board commissioner to right a wrong. Yet it is exactly this type of conduct that judicial immunity protects. "Judicial immunity recognizes that judges may make mistakes, and immunity is not removed even if a judge's actions include grave

procedural errors." Patterson v. Rodgers, 708 F.Supp.2d 225, 235 (D.Conn. 2010); see also Stump v. Sparkman, 435 U.S. 349, 355-60 (1978) (the doctrine of judicial immunity insulates judges from suit even in cases involving allegations of a constitutional violation). While unfortunate, these mistakes do not suggest an intentional desire to violate Plaintiff's constitutional rights, and it is well-settled that negligence alone does not give rise to a constitutional violation. Morello v. James, 810 F2d 344 (2d Cir. 1987).[16]

Finally, Plaintiff does not aver that Hayden or White was involved in the alleged conspiracy to rescind his parole, nor could he. At most, the evidence establishes that Hayden discussed initiating a rescission hearing with Molik, after learning from Asst. Grant and Chair. Travis that there existed grounds for a rescission hearing. Once the decision had been made to hold the hearing, Hayden directed Molik to serve Plaintiff with his release decision as well as a notice suspending his release date. (Hayden Decl. ¶¶ 13, 17; Pl. Ex. P (Hayden Dep.) at 63-65.) This is insufficient to establish that Hayden reached an understanding or had a meeting of the minds with the remaining State Defendants to violate Plaintiff's constitutional rights for purposes of a § 1983 conspiracy claim. Significantly, Hayden had no contact whatsoever with Dir. Lapp, the individual who set into motion the process leading up to Plaintiff's parole rescission.

Although he has tenuously linked each of the named Defendants and non-parties and detailed their alleged actions, "merely string[ing] together" adverse acts of individuals is insufficient to demonstrate the existence of a conspiracy." Harvey v. Harvey, 949 F.2d 1127, 1133 (11th Cir. 1992); see also, e.g., Powell v. Workmen's Comp. Bd. of the State

---

[16] It should be noted that this Court does not find that Plaintiff can maintain a negligence cause of action. See Discussion at III.B.4.b.

of N.Y., 327 F.2d 131, 137 (2d Cir. 1964) (finding no merit to plaintiff's conspiracy allegations where the facts indicated no more than the actions of several interested parties who vigorously sought to protect their own interests). For example, it is undisputed that Hayden and White had conversations with Grant and Tracy, and that they made arrangements for Plaintiff's file to be sent from Attica to the DOP Albany office. Without more, Plaintiff fails to establish that the State Defendants acted in concert, much less reached an agreement to orchestrate an unconstitutional rescission hearing. See Shabazz, 994 F.Supp. at 467.

Plaintiff has woven together a plausible scenario in which all of the state actors are present and involved, yet he provides no evidence to support it–many of his assertions rely on hearsay, assumptions, and speculation. The Court acknowledges that there is rarely direct evidence in existence to support a § 1983 conspiracy claim, but reminds Plaintiff that such a claim cannot be pursued on mere conjecture. See Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998) ( "conclusory allegations" or "unsubstantiated speculation" will not defeat summary judgment on § 1983 conspiracy claim).

Plaintiff also contends that Defendant Parole Officers Chard, Smith, and Perritano conspired with one another to threaten, intimidate, and humiliate Plaintiff in connection with his parole supervision. (2d Am. Compl. ¶¶ 111-114.) He further alleges that Parole Officer McCarthy conspired with Commr. Graber to "single Plaintiff out from all other parolees for invidiously discriminatory application of the parole rules and regulations by placing special conditions of parole on Plaintiff." (Id. ¶ 114.).

It is undisputed that Defendants Chard, Smith, Perritano, McCarthy, and Graber are all employed by the DOP, and as such, are subject to the protection of the so-called intra-

42

agency or intracorporate conspiracy doctrine, which provides that officers, agents and employees of a single corporate or municipal entity, each acting within the scope of his employment, are legally incapable of conspiring together. See Herrmann v. Moore, 576 F.2d 453, 459 (2d Cir. 1978) ("[T]here is no conspiracy if the conspiratorial conduct challenged is essentially a single act by a single corporation acting exclusively through its own ... officers[ ] and employees, each acting within the scope of his employment."); see also Rini v. Zwirn, 886 F.Supp. 270, 291 (E.D.N.Y. 1995) ("Intracorporate immunity has also been extended to the context of conspiracies between a public entity and its employees.") Under these circumstances, a civil rights conspiracy claim is precluded because Plaintiff has alleged in his second amended complaint only that these defendants joined and conspired with one another. (2d Am. Compl. ¶¶ 109-12.)

Plaintiff argues that to be entitled to the protections of the doctrine, one must be acting within the scope of one's employment, and the supervising Parole Officers did not act within the scope of their lawful authority. (Pl. Mem. at 30.). Plaintiff presents no evidence that Defendants Chard, Smith, Perritano, and McCarthy were motivated by independent personal interests, separate and apart from the interests of DOP. Rather, the record shows that the Parole Officers were performing their job duties in supervising Plaintiff, and, as discussed below, there is no evidence to give rise to an issue of fact that Plaintiff was singled out in his supervision or that any constitutional violation occurred. See Discussion at III.C.2.c-d.

To the extent Plaintiff argues that Parole Officer McCarthy conspired with the Syracuse Defendants to deny Plaintiff of his constitutional rights, that contention is analyzed, discussed, and rejected below. See Discussion at III.C.2.a. Accordingly, the §

1983 conspiracy claims relating to Plaintiff's parole supervision must be dismissed.[17]

### d.   First Amendment

Insofar as Plaintiff attempts to assert a First Amendment violation for the first time in his memorandum of law (Pl. Mem. at 23-24), such a claim cannot be entertained now.

It is well-settled "that a party cannot assert a claim for the first time in its motion papers." Global Crossing Bandwidth, Inc. v. Locus Telecomm., Inc., 632 F.Supp.2d 224, 245 (W.D.N.Y. 2009) (collecting cases). Plaintiff had ample opportunities to amend the complaint over the course of this suit's protracted litigation. "A summary judgment opposition brief is not a substitute for a timely motion to amend the complaint." Maharishi Hardy Blechman Ltd. v. Abercrombie & Fitch Co., 292 F.Supp.2d 535, 544 (S.D.N.Y. 2003).

There is no First Amendment claim articulated, nor or is the phrase "First Amendment" contained anywhere in Plaintiff's 67-page second amended complaint. (2d Am. Compl. ¶ 2 ) (alleging deprivation of rights under the Fourth, Fifth, and Fourteenth Amendments and state law).   As the State Defendants point out, simply interposing the word "retaliation" throughout the complaint will not sufficiently plead a cause of action under the First Amendment. See Keller v. Star Nissan, Inc., No. 07–CV–4551, 2009 WL 4281038, at *3 (E.D.N.Y. Nov. 30, 2009) (plaintiff's conclusory use of terms like "retaliation" were insufficient to plead causation for Title VII claim). The Federal Rules require "simple,

---

[17] Plaintiff has also not established an underlying constitutional violation relating to his parole supervision. Thus, even if the intra-agency conspiracy doctrine did not apply here, Plaintiff's claim against the Parole Officer Defendants would fail as a matter of law because he has not provided sufficient proof of an underlying violation of a federal right. See Singer v. Fulton Cnty. Sheriff, 63 F.3d 110, 119 (2d Cir. 1995) ("the [conspiracy] lawsuit will stand only insofar as the plaintiff can prove the *sine qua non* of a § 1983 action: the violation of a federal right").

concise, and direct" allegations which are decidedly absent from Plaintiff's lengthy, verbose amended complaint. Fed. R. Civ. P. 8(d)(1). Significantly, this is not the case of a *pro se* plaintiff who must be given special solicitude. See Wechsler v. R D Mgmt. Corp., 861 F.Supp. 1153, 1157 (E.D.N.Y. 1994) (explaining that special solicitude is extended to *pro se* litigants because of their lack of legal training).

For these reasons the Court rejects Plaintiff's attempt at untimely asserting a First Amendment claim, and Plaintiff's first cause of action alleging various constitutional violations under § 1983 is dismissed with respect to the State Defendants.

### 4. State Law Claims

All of Plaintiff's state law claims brought against DOP officers or employees in their individual capacities—here, claims for negligence, malicious prosecution, and various violations of the New York Constitution—must be dismissed pursuant to New York Executive Law § 259-q. (Am Compl. ¶¶ 120-129.) The State Defendants argue that § 259-q bars the state law claims against them in their personal capacities for acts and omissions which were done within the scope of their employment. (State Def. Mem. at 16-19.)

Section 259-q provides, in relevant part:

> No civil action shall be brought in any court of the state, except by the attorney general on behalf of the state, against any officer or employee of the board of parole or former division of parole, in his personal capacity, for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties by such officer or employee.

N.Y.  Exec. L. § 259-q.

Here, Defendants Hayden, White, Grant, Tracy, and Travis are or were employees or officers of DOP and all acted within the scope of their employment in their conduct

concerning Plaintiff's parole, regardless of Grant's and Tracy's motivation for seeking to rescind Plaintiff's parole.  See Sloane v. Getz, No. 00 Civ. 4708, 2001 WL 504879, at *5 (S.D.N.Y.  May 10, 2001) ("Since the defendants were functioning as parole officers during their interaction with the plaintiff, the state law claims must be dismissed even if the defendants abused their offices and otherwise violated the plaintiff's rights during their interaction."); Roberts v. Lapp, No. 02-CV-746, 2005 WL 578159 (W.D.N.Y.  Mar. 9, 2005) ("Generally, New York law only requires that a defendant employee's conduct be foreseeable within the scope of the employee's duties. That is, if a defendant's act is generally foreseeable, that act is considered to be within the scope of employment, even if the employee's act constitutes an intentional tort.") There is no evidence in the record indicating that the State Defendants acted outside the scope of their employment with regard to Plaintiff's parole proceeding when they reviewed Plaintiff's parole file and subsequently initiated and conducted the rescission hearing.[18]  But see  Cornell v. State of N.Y., 46 N.Y.2d 1032 (1979) (holding that a hospital attendant who sexually molested an infant was not acting within the scope of employment); Mary KK v. Jack LL, 203 A.D.2d 840  (3rd Dep't 1994) (holding that a teacher was acting outside the scope of employment when he sexually molested student during school hours and on school property); Savarese v. City of N.Y. Hous. Auth., 172 A.D.2d 506 (2nd Dep't 1991) (holding that a bartender who fought with a patron in the bar's parking lot was acting outside the scope of his employment); Garcia v. City of N.Y., 104 A.D.2d 438 (2nd Dep't 1984), aff'd, 65 N.Y.2d 805 (1985) (holding that an off-duty police officer was acting outside the scope of his

---

[18] The same reasoning applies to the State Defendants responsible for Plaintiff's parole supervision and ultimately, the revocation of his parole which he undisputedly violated in April, 2000.

employment when he deliberately shot the plaintiff).

Plaintiff's state law claims against the State Defendants in their individual capacities are therefore dismissed pursuant to N.Y. Exec. L. § 259-q.[19]

Alternatively, Plaintiff's state law claim of malicious prosecution, set forth in the third cause of action in the second amended complaint, is also subject to dismissal because it is untimely. (Am Compl. ¶¶ 123-126; Pl. Mem. 33.)

Under New York's civil procedure law, intentional torts carry a one-year statute of limitations from the date of accrual. N.Y.C.P.L.R. § 251(3).[20] The New York Court of Appeals has further specified that, "a tort cause of action cannot accrue until an injury is sustained. . . . That, rather than the wrongful act of defendant or discovery of the injury by plaintiff, is the relevant date for marking accrual." Kronos, Inc. v. AVX Corp., 81 N.Y.2d 90, 94 (1993). Here, Plaintiff commenced this action by filing the initial complaint on January 10, 2002 (Docket No. 1), over two years after the accrual of Plaintiff's claims for malicious prosecution. Those claims accrued when Plaintiff was released on parole in December, 1999, pursuant to judicial order. See 10 Ellicott Sq. Ct. Corp. v Violet Realty, Inc., 81 A.D.3d 1366 (4th Dep't 2011) (It is long settled that those causes of action accrue when plaintiff[s] first become[] entitled to maintain the action[, ]i.e., when there is a determination favorable to plaintiff[s], notwithstanding the pendency of an appeal.") (internal quotation omitted). Plaintiff's state law claim for malicious prosecution should also be dismissed because it is time-barred.

---

[19] Plaintiff's claims against the State Defendants in their official capacities have been previously dismissed by this Court. (Docket No. 68 at 16-19.)

[20] Plaintiff brought his malicious prosecution claim exclusively under New York law. (2d Am. Compl. ¶ 125.)

Likewise, even if Plaintiff's negligence claim, contained in the fourth cause of action of the second amended complaint, were not statutorily barred, it nonetheless fails as a matter of law. (2d Am. Compl. ¶¶ 127-129.)

To establish a cause of action for negligence in New York, a plaintiff must prove: "(1) a duty owed by the defendant to the plaintiff, (2) a breach thereof, and (3) injury proximately resulting therefrom." Solomon ex rel. Solomon v. City of N.Y., 66 N.Y.2d 1026, 1027 (1985); see, e.g., Lerner v. Fleet Bank, N.A., 459 F.3d 273, 286 (2d Cir. 2006) (quoting Solomon, 66 N.Y.2d at 1027); DiBenedetto v. Pan Am World Serv., Inc., 359 F.3d 627, 630 (2d Cir. 2004) (same). If the plaintiff's evidence is insufficient as a matter of law to carry the plaintiff's burden of proof on even one of the three elements of the negligence cause of action by a preponderance of the admissible evidence, summary judgment must be entered against the plaintiff. Fed.R.Civ.P. 56(a), (e); see, e.g., Rothstein v. City of New York, 2011 WL 3273473 (S.D.N.Y. July 29, 2011).

The threshold question of whether a duty is owed to a plaintiff is a question of law, see Palka v. Servicemaster Mgmt. Servs. Corp., 83 N.Y.2d 579, 585 (1994) ("the definition of the existence and scope of an alleged tortfeasor's duty is usually a legal, policy-laden declaration reserved for judges to make prior to submitting anything to fact-finding or jury consideration" (citations omitted)); Gilson v. Metro. Opera, 5 N.Y.3d 574, 576–77 (2005); Guest v. Hansen, 603 F.3d 15, 21 (2d Cir. 2010). Although Plaintiff urges that the State Defendants owed him a duty "to not unlawfully interfere with the parole process for political and personal gain," his assertion finds no support in New York jurisprudence that this Court

is aware of, and Plaintiff fails to provide any relevant law standing for such a proposition.[21] (Pl. Mem. at 45.)  Absent such a duty and no basis for the Court to conclude that one exists, Plaintiff's negligence cause of action must fail.

Finally, the Court notes that Plaintiff has characterized all of the State Defendant's conduct as intentional. As such he cannot assert a negligence claim for intentional conduct. Dewitt v. Home Depot U.S.A., Inc., No. 10-CV-3319, 2012 WL 4049805, at *10 (E.D.N.Y. Sept. 12, 2012). In sum, Plaintiff's fourth cause of action alleging negligence must be dismissed.

For all of these reasons, the State Defendants are entitled to judgment as a matter of law with respect to all of Plaintiff's claims, and the second amended complaint is dismissed as to the State Defendants.

The Court will now address the Syracuse Defendants' motion for summary judgment.

## C.    Syracuse Defendants' Motion

The Syracuse Defendants move for summary judgment on the grounds that: (1) the claims arising out of Plaintiff's parole revocation have previously been dismissed by this Court; (2) Plaintiff's § 1983 conspiracy claim fails as a matter of law; (3) the Syracuse Defendants are entitled to qualified immunity; (4) Plaintiff failed to serve the city with a

---

[21] Plaintiff cites to Smiley v. Davis, No. 87 CIV. 6047, 1988 WL 78306 (S.D.N.Y. July 14, 1988) in support of his contention that the State Defendants "breached the proper standard of care for preparing for, bringing about, and proceeding with a rescission hearing and revocation hearing . . . . state a viable claim for negligence under New York law." (Pl. Mem. at 45.) The Court does not read Smiley in this manner. In that case, the plaintiff's complaint alleged that the Division of Parole "negligently, carelessly and intentionally failed to perform its duties with respect to Smiley's parole status." 1988 WL 78306, at *1. The district court, however, did not discuss a potential cause of action for negligence in its decision, and granted the majority of the DOP defendants' motion to dismiss on immunity grounds. Id. at *1-*6.

verified claim as required by municipal law; (5) Plaintiff already has an adequate remedy at law for the alleged violations of his state constitutional rights; (6) Plaintiff fails to prove the requisite elements of a selective/malicious prosecution claim; and (7) Plaintiff fails to prove the requisite elements of a state law negligence claim. (Syr. Def. Mem. (Docket No. 230) at 6-24.)

In its Decision and Order dated July 31, 2003, this Court dismissed Plaintiff's claims in the amended complaint relating to Plaintiff's parole revocation. (Docket No. 68.). Thus, the claims left on this motion for summary judgment are those arising out of Plaintiff's parole rescission and supervision. Plaintiff has at no time alleged that the Syracuse Defendants participated or played a role in the rescission of his parole, therefore, the only remaining claims pertaining to the Syracuse Defendants are those relating to his parole supervision.

For the reasons that follow, the Syracuse Defendants' motion for summary judgment is granted in its entirety, and the second amended complaint is dismissed with respect to the Syracuse Defendants.

## 1.   __Heck__ Doctrine

As discussed at length above, Plaintiff is incorrect in his assertion that his parole revocation claims have been re-pleaded, or that he has bypassed the application of Heck by receiving a favorable termination of his Article 78 proceeding in Wyoming County Supreme Court. See Discussion at  III.B.1. For the reasons previously stated, the claims relating to Plaintiff's parole revocation remain barred and are dismissed from this action with respect to all named Defendants.

**2.** **§ 1983 Claims**

**a.** **Conspiracy**

Plaintiff advances a § 1983 conspiracy claim against the Syracuse Defendants, asserting that SPD Officers Murfitt, Gilhooley, and Former Syracuse Police Chief John Falge conspired with Parole Officer McCarthy to violate Plaintiff's constitutional rights. (2d Am. Compl. ¶¶ 114-117.)

As stated earlier, to prove a § 1983 claim for conspiracy, Plaintiff must establish an agreement to inflict an unconstitutional injury and an overt act done in furtherance of that goal. Pangburn, 200 F.3d at 72.

Plaintiff fails to show that any unlawful agreement existed between the Syracuse Police Officers and Parole Officer McCarthy of DOP.  Simply because Parole Officer McCarthy requested assistance from the SPD's Criminal Investigation Division, Selective Enforcement Section, to conduct surveillance of Plaintiff, does not give rise to a conspiracy because collaboration between probation officers and law enforcement officers is a permissible and common practice. See U.S. v. Reyes, 283 F.3d 446, 459 (2d Cir. 2002) ("One of the principal purposes of a probation/parole officer's observation and supervision responsibilities is to ensure that a convicted person under supervision does not again commit a crime. We have long recognized a duty on the part of the parole officer to investigate whether a parolee is violating the conditions of his parole." )  Here, McCarthy and the SPD Officers were merely executing their professional duties in jointly supervising Plaintiff on parole.

Moreover, Plaintiff does not establish an underlying violation of his constitutional rights under the Fourth, Fifth, and Fourteenth Amendments, as discussed in further detail

below. Without a constitutional infirmity, a § 1983 conspiracy claim cannot stand.  See Singer, 63 F.3d at119 ("the [conspiracy] lawsuit will stand only insofar as the plaintiff can prove the sine qua non of a § 1983 action: the violation of a federal right"); accord, Mitchell v. Cnty. of Nassau, CV–05–4957, 2011 WL 1113767 (E.D.N.Y.  Mar. 24, 2011) ("[A] § 1983 conspiracy claim fails as a matter of law where there is no underlying constitutional violation.") (citing Curley v. Vill. of Suffern, 268 F.3d 65, 72 (2d Cir. 2001)).

Because there is insufficient evidence in the record to establish the requisite elements to give rise to a claim for conspiracy under § 1983, Plaintiff's first cause of action as it relates to the State Defendants is dismissed.

### b.    Constitutional Claim against the City of Syracuse

Plaintiff has also advanced a § 1983 claim for municipal liability against the City of Syracuse. Specifically, that the City violated Plaintiff's rights by permitting its policy maker, John Falge, to deliberately target the Plaintiff for selective and discriminatory treatment and under a theory of *respondeat superior*. (2d Am. Compl. ¶ 118.)

A municipality may be held liable for damages under 42 U.S.C. § 1983 only when execution of government policy or custom inflicts the injury in question. Monell v. Dep't of Soc. Servs. of City of N.Y., 436 U.S. 658 (1978). A municipality cannot be held liable on the theory of *respondeat superior* or simply because it employs a tortfeasor. Id. Thus, a § 1983 plaintiff must set forth facts showing the existence of the offending policy or custom. Id. Stated another way, the municipality must be the moving force behind the injury alleged, and mere allegations are insufficient. Bd. of Cnty. Comm'rs Bryan Cnty., Okl. v. Brown, 520 U.S. 397 (1997).

Here, Plaintiff only offers mere allegations–he has not presented any evidence of

a municipal policy or custom that caused any injury resulting from his parole supervision, and offers no evidence supporting his claim that the City "permitted" John Falge to infringe on Plaintiff's constitutional rights. (2d Am. Compl. ¶ 118.) Rather, Plaintiff simply recites all of the alleged conduct by the individual Syracuse Defendants, without reference to any policy or custom. (Id.) Nor does he elaborate on his claim against the City of Syracuse in his memorandum of law. (Pl. Mem. 37-39.) This is clearly not enough to establish Monell liability. See Missel v. Cnty. of Monroe, 351 Fed.Appx. 543, 545 (2d Cir. 2009) ( "A plaintiff must prove that "policies or customs that [were] sanctioned" by the municipality led to the alleged constitutional violation.") (quoting  Segal v. City of N.Y., 459 F.3d 207, 219 (2d Cir. 2006)).  Most importantly, Plaintiff fails to establish any constitutional violation arising out of his parole supervision. See Discussion at III.C.2.c.-d.

Summary judgment on Plaintiff's § 1983 claim is therefore warranted for the City of Syracuse on Plaintiff's Monell claim.

### c.    Selective Enforcement

Plaintiff has alleged that the Syracuse Defendants, through a "selective discriminatory investigation," violated Plaintiff's right to equal protection. (2d Am. Compl. ¶ 115-117.)

In order to establish a claim of selective enforcement of the law, a defendant must show:

> (1) the person, compared with others similarly situated, was selectively treated, and (2) the selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations, such as race or religion, to punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure the person.

FSK Drug Corp. v. Perales, 960 F.2d 6, 10 (2d Cir. 1992)

This Court previously observed, with respect to the State Defendants, there is no evidence in the record showing: (1) the existence of any similarly-situated parolees, whose underlying conviction involved the murder of parole officer or otherwise; (2) differential or selective treatment; or (3) that such treatment was due to impermissible considerations. Rather, the evidence establishes that Plaintiff was treated, with regard to his parole supervision, like any other violent felon parolee, with the same standards imposed upon him and the same protocol followed by the SPD Officers. For example, Plaintiff provides no evidence beyond his own assertion that the Parole Flyer was generated by the SPD for any reason other than officer safety or that it was disseminated in a manner outside of standard procedures. (Pl. Mem. at 37; Syr. Def. Ex. L (DuVal Response to Pl. Interrog.) at (8).) Plaintiff also does not identify any similarly-situated individuals, nor does he provide evidence that the alleged selective treatment was motivated by impermissible considerations. He does not even suggest ill-will on behalf of the SPD Officers, only that they must have been complicit in the alleged widespread conspiracy among all of the individuals in this action to deprive him of his parole, which this Court has already considered and rejected based on the undisputed facts and the evidence in the record.

Because Plaintiff has not established the elements of a selective enforcement claim, summary judgment is warranted in favor of the Syracuse Defendants.

### d.    Search and Seizure

Plaintiff also alleges that the Syracuse Defendants subjected him to an illegal search and seizure in violation of the Fourth Amendment to the United States Constitution, arising out of Plaintiff's surveillance and arrest at the Bottom Line gentleman's club in Syracuse,

New York. (2d Am. Compl. ¶ 115-116.)

It is well-settled that "[p]arolees subject to terms and conditions of release 'have severely diminished expectations of privacy by virtue of their status alone.'" U.S. v. Quinones, 457 Fed.Appx. 68 (2d Cir. 2012) ((quoting Samson v. California, 547 U.S. 843, 852 (2006)). And, while it is true that a parolee has a right to be free from an arrest in the absence of probable cause, see Scotto, 143 F.3d at 113, there is no evidence that the surveillance of Plaintiff was unlawful or that his apprehension was not supported by probable cause. Notably, one state court has already rejected his challenge to the admissibility of the evidence presented at his revocation hearing, finding that Plaintiff "did not establish that the evidence underlying the probable cause determination was illegally obtained." People ex rel. Victory v. Travis, 288 A.D.2d 932 (4th Dep't 2001).

Plaintiff claims that the Syracuse Defendants placed a Global Positioning System ("GPS") device on Plaintiff's vehicle, but he has not proffered any admissible evidence that such a device was actually placed. The exhibits establish only that the GPS was discussed by DOP employees as a means to monitor Plaintiff, in addition to other methods.  (Pl. Exs. XXX, IIII (McCarthy Dep.) at 39-42, UUUU.)

Contrary to his next assertion, the SPD Officers' visual observation of Plaintiff's Jeep Cherokee prior to his arrest at the Bottom Line does not constitute a search under the Fourth Amendment. Palmieri v. Lynch, 392 F.3d 73 (2d Cir. 2004) (citing, inter alia, Arizona v. Hicks, 480 U.S. 321, 328  (1987) ("A truly cursory inspection-one that involves merely looking at what is already exposed to view, without disturbing it-is not a 'search' for Fourth Amendment purposes, and therefore does not even require reasonable suspicion")). Although Plaintiff seeks to characterize the parking garage as private property accessible

only by tenants of the building, the testimony of the parking garage attendant proves otherwise. (Pl. Resp. to Syr. Def. Stmt. ¶ 27;  Syr. Def. Ex. T (Peletski Dep.) at 27.)

There also is no evidence that the Terry stops[22] made by SPD officers at the Bottom Line and later, outside of his residence, were unlawful. An investigatory Terry stop is permissible where law enforcement has reasonable suspicion that a parolee is violating the terms of his parole. Roberts v. Lapp, 297 Fed. Appx. 67, 70 (2d Cir. 2008). Here, the SPD officers possessed the requisite reasonable suspicion after observing him in a bar with a beer in front of him to stop and briefly investigate Plaintiff when it was known that drinking alcohol and patronizing an establishment that serves alcohol was prohibited conduct under the terms of Plaintiff's parole. Significantly, Plaintiff does not contend that he was not in violation of the terms of his parole when he consumed alcohol at the Bottom Line gentleman's club, and has admitted to the violative conduct under oath.

Finally, Plaintiff suggests that whether he violated parole is an issue of fact. (Pl. Mem. at 39.) This is flatly contradicted by his own sworn testimony that he was directed not to use alcohol, and that he did consume alcohol the day he was arrested for violating his parole. (Pl. Resp. to State Def. Stmt. ¶ 136, 202; Pl. Ex. B, State Def. Ex. A (Victory Dep.) at 229, 231.)

For these reasons Plaintiff's Fourth Amendment search and seizure claims fail as a matter of law, and summary judgment is granted to the Syracuse Defendants on all of

---

[22] See Terry v. Ohio, 392 U.S. 1, 30 (1968) (Fourth Amendment prohibition on unreasonable searches and seizures is not violated when a police officer stops a suspect on the street and frisks him or her without probable cause to arrest, if the police officer has a reasonable suspicion that the person has committed, is committing, or is about to commit a crime).

the § 1983 claims listed in the first cause of action of the second amended complaint.[23]

### 3.    State Law Claims

#### a.    Malicious Prosecution

Plaintiff asserts a claim for malicious prosecution under New York common law against the Syracuse Defendants in the third cause of action of the second amended complaint. (2d Am. Compl. ¶ 123-126.) As previously discussed, this claim is untimely. See Discussion at III.B.4. In any event, Plaintiff does not establish the required elements for a malicious prosecution claim.

Malicious prosecution has the following elements under New York law: "(1) the commencement or continuation of a criminal proceeding by the defendant against the plaintiff, (2) the termination of the proceeding in favor of the accused, (3) the absence of probable cause for the criminal proceeding and (4) actual malice." Broughton, 37 N.Y.2d at 456.

The only claim Plaintiff can theoretically assert against the Syracuse Defendants would be in connection with his parole supervision and apprehension leading up to the revocation proceedings, and such a claim would nonetheless fail because he cannot establish any of the elements of a malicious prosecution claim. Here, the record shows that the Syracuse Defendants did not initiate the revocation proceedings against Plaintiff, his parole revocation was not overturned or invalidated, and his parole violation was clearly supported by probable cause, which is a complete defense to a claim of malicious

---

[23] Since Plaintiff has not established that the Syracuse Defendants violated his constitutional rights, the Court does not address whether Murfitt, Gilhooley, and Falge are entitled to qualified immunity. See, e.g., Carnell v. Paterson, 385 Fed. Appx. 15 (2d Cir. 2010).

prosecution. <u>Lawson v. City of N.Y.</u>, 83 A.D.3d 609 (1st Dep't 2011) .

For these reasons, the third cause of action is dismissed with respect to the Syracuse Defendants.

### b.   Negligence

In the fourth and fifth causes of action in the second amended complaint,  Plaintiff alleges negligence on behalf of the individual defendants and the City of Syracuse. (Am Compl. ¶¶ 127-133)

"To sustain liability against a municipality, the duty breached must be more than that owed the public generally." <u>Valdez v. City of N.Y.</u>, 18 N.Y.3d 69, 75 (2011). Plaintiff fails to meet the threshold burden that the Syracuse Defendants, in performing their governmental duties, owed him a special duty of care apart from any duty owed to the public in general. "[A]n agency of government is not liable for the negligent performance of a governmental function unless there existed 'a special duty to the injured person, in contrast to a general duty owed to the public.'" <u>McLean v. City of N.Y.</u>, 12 N.Y.3d 194, 199 (2009) (quoting <u>Garrett v. Holiday Inns</u>, 58 N.Y.2d 253, 261 (1983)).

Plaintiff alleges that the Syracuse Defendant's owed Plaintiff a duty to "not unlawfully interfere with the parole process for political and personal gain." (Pl. Mem. at 45.)  While novel, this  supposed "duty" does not fit within the parameters giving rise to a special relationship under New York law. Rather, a special duty exists between a governmental agency and an injured individual: "(1) when the municipality violates a statutory duty enacted for the benefit of a particular class of persons; (2) when it voluntarily assumes a duty that generates justifiable reliance by the person who benefits from the duty; or (3) when the municipality assumes positive direction and control in the face of a

58

known, blatant and dangerous safety violation." <u>Pelaez v. Seide</u>, 2 N.Y.3d 186, 199-200 (2004). Significantly, Plaintiff does not allege that such a special duty exists, and it is well-settled that discretionary governmental acts cannot be the basis for a negligence claim. <u>See</u> <u>McLean</u>, 12 N.Y.3d at 203 ("Government action, if discretionary, may not be a basis for liability, while ministerial actions may be, but only if they violate a special duty owed to the plaintiff, apart from any duty to the public in general."). Finally, there is no evidence that any of Plaintiff's rights were violated by the Syracuse Defendants. Without an injury, a negligence claim cannot stand. <u>See generally</u> <u>Solomon</u>, 66 N.Y.2d at 1027.

The State Defendants are entitled to judgment as a matter of law on the fourth and fifth causes of action in the second amended complaint.

### c.    Remaining Claims

Insofar as any state law claims remain on this motion, The Court declines to exercise supplemental jurisdiction over them as all of Plaintiff's federal claims have been dismissed against all of the Defendants. <u>See</u> 28 U.S.C. § 1367(c)(3) (permitting a district court to decline to exercise supplemental jurisdiction where "the district court has dismissed all claims over which it has original jurisdiction").

## IV. CONCLUSION

For the foregoing reasons, this Court finds that the State Defendants and the Syracuse Defendants are entitled to summary judgment, and the second amended complaint (Docket No. 162) is therefore dismissed.

## V.  ORDERS

IT HEREBY IS ORDERED, that the State Defendants' motion for summary

judgment (Docket No. 228) and the Syracuse Defendants' motion for summary judgment

(230) are GRANTED in their entirety;

      FURTHER, that the Clerk of the Court is directed to take the necessary steps to

close this case;

      SO ORDERED.

Dated:  August 25, 2013
      Buffalo, New York

                            /s/William M. Skretny
                           WILLIAM M. SKRETNY
                                Chief Judge
                       United States District Court